# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

EMERGENCY RECOVERY, INC.
and BOBBIE CELLER,

     Plaintiffs,

v.                                                                  Case No. 8:23-cv-957-KKM-AEP

GOVERNMENT EMPLOYEES
INSURANCE COMPANY et al.,

     Defendants.

_____

## <u>ORDER</u>

Emergency Recovery, Inc., (ERI) and ERI's owner, Bobbie Celler, sue Government Employees Insurance Company and related entities (collectively, GEICO) for defamation and tortious interference with a business relationship allegedly caused by a GEICO press release. 2d Am. Compl. (Doc. 80). GEICO moves for summary judgment. Mot. (Doc. 132). Because Celler lacks standing and no reasonable jury could conclude that the press release caused the harm that ERI claims, I dismiss Celler's claim without prejudice and grant GEICO's motion as to ERI's claims.

## I.    BACKGROUND

ERI is a Florida corporation that "identif[ies] insurance information on behalf of its clients" and "submit[s] bills and demand letters to insurance companies to seek payment of motor vehicle accident-related insurance

proceeds." Joint Statement of Undisputed Facts (JSUF) (Doc. 130) ¶¶ 3, 8. At all times relevant to this litigation, Celler was ERI's President and CEO. *Id.* ¶ 6. In 2018 and 2019, ERI submitted thousands of demand letters and bills to GEICO to recover Personal Injury Protection (PIP) benefits allegedly due to ERI's clients. *See id.* ¶ 12; (Doc. 129-34) ¶ 2. GEICO and ERI disagreed about the amount owed on some of these claims, leading to a series of settlements between the two and, eventually, to GEICO suing ERI, Celler, and two medical facilities that were clients of ERI's. JSUF ¶¶ 14–18.

In that state-court lawsuit, which GEICO filed on February 28, 2020, GEICO asserted that ERI sent deceptive or misleading bills and demand letters and submitted the bills in bulk to deceive GEICO into believing the claims were legitimate when they were not. *Id.* ¶¶ 18–21. On March 2, 2020, GEICO issued a press release announcing the lawsuit:

> In a continuing effort to combat insurance fraud and other deceptive and abusive practices being committed in Florida, GEICO has filed a lawsuit against Bobbie Celler, his collection company and two for-profit Florida hospitals seeking to terminate a scheme it alleges violates Florida law and aimed to mislead the insurer. In its lawsuit, GEICO seeks permanent injunctive and declaratory relief, as well as damages under Florida law, including Florida's Deceptive and Unfair Trade Practices Act. GEICO says that the Florida action is a preview of similar lawsuits that will be filed in the future.
>
> GEICO alleges that the Defendants engaged in a deceptive and misleading scheme in which bills for payment of hospital and professional services were presented in a volume and

2

manner designed to mislead and/or deceive GEICO into believing that the claims were legitimate and that the amounts demanded were actually due and owing, when in fact that was not the case. In addition, GEICO alleges that the deceptive/misleading manner in which the claims were presented was designed to deprive GEICO from determining whether payment was legitimately owed so as to be able to exercise its statutory right to accurately consider and cure disputed payments.

"GEICO has a zero tolerance policy when it comes to insurance fraud and abusive/misleading practices that attempt to advance that fraud," said Tara Carthew, assistant vice president of claims in GEICO's Lakeland, Florida, office. "These incidents of fraud and related practices hurt consumers because they cause premiums to increase." Carthew went on to say that GEICO has a long history of seeking out individuals willing to commit fraud. "GEICO intends to file future lawsuits to continue making every effort to protect its customers and the public from fraudulent practices such as those set forth in the Complaint."

*Id.* ¶¶ 22–23. The state court dismissed GEICO's initial and amended complaints and GEICO dismissed its lawsuit on April 12, 2021. *Id.* ¶¶ 24–25; *see* (Doc. 129-55).

On February 25, 2022, ERI and Celler sued GEICO in Florida state court. Notice of Removal (Doc. 1) at 2. GEICO removed the lawsuit to federal court and the Southern District of Florida transferred the action to this Court. JSUF ¶¶ 27–28. On March 13, 2024, I dismissed portions of the amended complaint. Order on Mot. to Dismiss Am. Compl. (Doc. 77). ERI and Celler filed a second amended complaint, and each asserts a defamation claim against

GEICO because the allegedly false and defamatory press release suggests that they "conducted their activities in a fraudulent and deceptive manner." 2d Am. Compl. ¶ 29, 38–49. ERI also alleges a tortious interference claim based on purported interference with its relationship with Conifer Cycle Solutions, LLC. *Id.* ¶¶ 50–63; JSUF ¶ 30.

Conifer is owned by Tenet Healthcare Corporation, which owns acute care facilities, hospitals, and other medical centers throughout the United States. JSUF ¶ 31. Conifer seeks to recover money for medical services provided by Tenet's medical facilities. *Id.* ¶ 32. ERI's business relationship with Conifer is the only relationship that ERI and Celler identify as harmed by the press release. *Id.* ¶ 33.

In 2014, Conifer hired ERI to perform work on its "retrospective" business, which involved identifying insurance coverage for patients that another party, often the medical provider itself, had already attempted to recover. *See id.* ¶ 34. On March 2018, Conifer hired ERI and another entity, Change Healthcare, to tackle its "Day 1" business, which involved identifying potential insurance coverage for patients at Tenet facilities beginning immediately upon the start of their treatment. *Id.* ¶¶ 35, 37–38. ERI preferred Day 1 work to retrospective work because "it's a lot more revenue for the client and for [vendors like ERI]." Celler Dep. (Doc. 129-1) 141:13. Day 1 work comes with "a different level of expectation from the customer, and it's a lot more

4

volume." *Id.* 141:11–12. Conifer hired ERI and Change Healthcare to do the
Day 1 work for a two-year term ending on March 30, 2020. JSUF ¶¶ 35–36.
Before submitting the joint proposal to Conifer for the Day 1 work, Change
Healthcare and ERI formed a strategic partnership assigning Change
Healthcare primary responsibility for the Day 1 work and ERI primary
responsibility for the retrospective work. *Id.* ¶ 39. In early 2019, ERI
terminated this strategic partnership with Change Healthcare and began
servicing Conifer's retrospective and Day 1 work on its own. *Id.* ¶ 40.

ERI terminated both its Chief Operating Officer and Senior Vice
President of Operations in January 2019. *Id.* ¶¶ 41–43. After these
terminations, ERI consisted of four persons: Celler, a Director of Finance, a
Director of Revenue Cycle, and an independent contractor residing in India.
*Id.* ¶¶ 44–48. Celler also relied on family members to help run ERI at this time.
*Id.* ¶ 48.

On March 20, 2020, Conifer gave ERI notice that it would no longer place
Day 1 accounts with ERI and instructed ERI to continue working existing
claims in accordance with the wind-down period in the statement of work
governing the parties' relationship. *Id.* ¶ 49. On May 29, 2020, Conifer
requested that ERI continue working Day 1 accounts for at least twenty-four
medical facilities because Conifer was not ready to move those accounts from
ERI. *Id.* ¶ 50. On February 1, 2021, Conifer again gave ERI notice that it would

no longer place Day 1 accounts with ERI and instructed ERI to continue working Day 1 accounts through May 17, 2021, according to the parties' agreed wind-down period. *Id.* ¶ 51. ERI continued performing retrospective work for Conifer until ERI terminated its relationship with Conifer on May 17, 2024. *Id.* ¶¶ 52–53.

GEICO moves for summary judgment. ERI and Celler oppose. Resp. (Doc. 147).

## II.   LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant always bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate a lack of genuine issue of material fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). When that burden is met, the burden shifts to the nonmovant to present evidentiary materials (e.g., affidavits, depositions, exhibits, and so on) demonstrating that there is a genuine issue of material fact, which precludes summary judgment. *Id.* A moving party is entitled to summary judgment if the nonmoving party "fail[s]

6

to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

I review the record evidence as identified by the parties and draw all legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020). Here, to the extent that the record is disputed or capable of multiple inferences, I draw them for the nonmovant.

## III.  ANALYSIS

GEICO argues for summary judgment on the defamation claims on the grounds that there are no genuine issues of material fact and the plaintiffs have failed to put forth evidence from which a reasonable jury could conclude (1) that the press release contains a false statement and, thus, is defamatory; (2) that any defamatory statements in the press release caused the plaintiffs' damages; and (3) that GEICO negligently published any defamatory statements in the press release.[1] *See* Mot. at 8–11, 15–21. As for the tortious interference claim, GEICO argues that there are no genuine issues of material fact and (1) ERI cannot prove that the press release caused its damages, (2) the press release contained only true statements, which cannot be the basis for

---

[1] The parties appear to agree that the plaintiffs are private figures and thus the negligence standard applies. *See* Mot. at 7, 20; Resp. at 16–17. Because ERI's defamation claim fails on causation and Celler lacks standing, I need not consider the issue.

tortious interference, and (3) the single action rule bars the tortious interference claim. *See id.* at 21–29. The plaintiffs oppose each of GEICO's arguments and claim that there are questions of fact for each of the challenged elements. *See* Resp. at 2–5, 9–25.

Because Celler lacks standing I dismiss his claim without prejudice. GEICO is entitled to summary judgment against ERI because ERI has failed to put forth any evidence from which a reasonable jury could conclude that the press release caused the only identified harm—the partial disruption of ERI's business relationship with Conifer. Thus, I do not decide the issues raised in the other arguments.

## A. Celler Lacks Standing

Before considering the parties' arguments, there is a threshold problem with Celler's defamation claim: he does not identify any harms that he has suffered. Without an injury, he lacks standing to sue.[2]

---

[2] Although, at times, there are "limited circumstances [where] 'elementary principles of procedural fairness' mandate that a court provide the party with 'an opportunity to provide evidence of [its standing]' instead of *sua sponte* dismissing the action for lack of jurisdiction," *City of Miami Gardens v. Wells Fargo & Co.*, 956 F.3d 1319, 1320 (11th Cir. 2020) (quoting *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 271 (2015)), this is not such a time. *See Artistic Ent., Inc. v. City of Warner Robins*, 331 F.3d 1196, 1202 (11th Cir. 2003) ("[W]here a legal issue has been fully developed, and the evidentiary record is complete, summary judgment is entirely appropriate even if no formal notice has been provided."). From the day that he filed the complaint, Celler has had notice that he would need to prove damages caused by GEICO. He has had the full discovery period to establish facts proving these elements. The issue of standing is intertwined with the issue of proving his only claim. There is no

8

Article III limits the jurisdiction of federal courts to "Cases" and
"Controversies," *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)
(quoting U.S. CONST. art. III, § 2, cl. 1); *Lujan v. Defs. of Wildlife*, 504 U.S. 555,
559 (1992), thereby "confin[ing] the federal courts to a properly judicial role,"
*Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). As such, federal courts must
independently assure themselves that they have jurisdiction over a case at
every stage, regardless of whether the parties raise the issue or agree that
jurisdiction exists. *See Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554
U.S. 316, 324 (2008); *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir.
2020). "Federal courts have an obligation to examine *sua sponte* their own
jurisdiction over a case, notwithstanding the contentions of the parties"
because "subject-matter jurisdiction underlies a court's power to hear a case."
*DeRoy v. Carnival Corp.*, 963 F.3d 1302, 1311 (11th Cir. 2020).

The party invoking federal jurisdiction bears the burden of proving
standing. *Lujan,* 504 U.S. at 561. Moreover, each element of standing "must be
supported in the same way as any other matter on which the plaintiff bears
the burden of proof, *i.e.*, with the manner and degree of evidence required at
the successive stages of the litigation." *Id.* Therefore, at the summary judgment

---

procedural unfairness—indeed his claim would fail for lack of causation for the same
reasons that ERI's claims fail.

stage, the plaintiff can no longer rest on " 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which . . . will be taken to be true." *Id.* (citation modified).

To establish standing, the burden is on a plaintiff to show that that he: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo,* 578 U.S. at 338. In their second amended complaint, Celler and ERI fail to allege damages for the defamation claims beyond making conclusory statements of reputational harm. *See* 2d Am. Compl. ¶¶ 38–49. This issue existed in the previous iterations of the complaint and GEICO waived the damages argument by not raising it sooner. *See* Order on Mot. to Dismiss 2d Am. Compl. (Doc. 112) at 5–6. As noted, the parties now agree that the only possible injury from the press release is Conifer's reduction in providing Day 1 work to ERI. *See* JSUF ¶¶ 33, 35, 49–51. The problem for Celler is that this harm is ERI's, not his. Conifer hired ERI to do the Day 1 work, it did not hire Celler individually. *See id.* ¶¶ 35, 37–38. Thus, any business that ERI lost from Conifer harmed ERI, not Celler. *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1323–25 (11th Cir. 2004) (holding that the chairman of a corporation and shareholder lacked standing to maintain an action in his own name to redress injuries to a corporation); *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972) ("The injury in fact test requires more than an injury to a

cognizable interest. It requires that the party seeking review be himself among
the injured") (citation modified); *cf. Falic v. Legg Mason Wood Walker, Inc.*, 347
F. Supp. 2d 1260, 1269–70 (S.D. Fla. 2004) (concluding that individual owners
were not proper parties to bring suit for lost business caused by alleged
defamation because lost business was harm to the company).

Absent any harm beyond economic harm to ERI through its loss of
business, Celler fails to show he suffered an injury in fact. Thus, he lacks
standing to sue, and I dismiss his claim without prejudice.

### B. No Reasonable Jury Could Find Causation in ERI's Claims

I analyze causation in ERI's defamation and tortious interference claims
together because both rise and fall on the same question—whether the press
release caused Conifer to shift Day 1 business away from ERI. As explained
below, both torts turn on the same facts and use the same causation standard.
The parties also agree that both require identical analysis. *See* Mot. at 15–22;
Resp. at 9–15, 17.

To show causation, ERI must produce *some* evidence connecting the
press release to Conifer's decision. Instead, ERI fails to put forth evidence that
anyone at Conifer even knew of the press release at the relevant time. As I
discussed in the order dismissing portions of the first amended complaint, the
press release is largely an accurate summary of the complaint in the
underlying lawsuit. *See* Order on Mot. to Dismiss Am. Compl. at 7. Only one

11

statement in the press release strays from strictly recounting the underlying complaint into asserting a potentially defamatory or false claim: "These incidents of fraud and related practices hurt consumers because they cause premiums to increase." JSUF ¶ 23.

For the defamation claim, ERI must show that any defamatory portions of the press release are responsible for Conifer's decision. For the tortious interference claim, ERI must demonstrate that any false statements in the press release caused Conifer's decision.

In the operative complaint, ERI alleges that GEICO, by publishing false statements in the press release that GEICO intended would injure ERI's reputation with existing and prospective customers, interfered with ERI's relationship with Conifer. *See* 2d Am. Compl. ¶¶ 52, 54–55. ERI also alleged additional acts by GEICO that fell within the litigation privilege and cannot be a basis for tortious interference. *See* 2d Am. Compl. ¶¶ 57–58; Order on Mot. to Dismiss 2d Am. Compl. at 11–16. While not clearly stated as such in the operative complaint, the parties have treated the allegations in ¶ 57 as identical to those in ¶ 58 and thus subject to the same litigation privilege defense. *See* Mot. to Dismiss 2d Am. Compl. (Doc. 81) at 20–22; Resp. to Mot. to Dismiss 2d Am. Compl. (Doc. 82) at 14.

GEICO asserts that ERI fails to produce "*a single piece of evidence* reflecting that any damages were proximately caused by Conifer's review of

the Press Release." Mot. at 16. I agree that is factually true based on the record presented by the parties. ERI cannot even show any evidence that the press release as a whole or any portion thereof caused its damages, much less that the potentially defamatory or false statement caused Conifer's decision to wind-down Day 1 work with ERI.

"Defamation under Florida law has these five elements: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)). Under Florida law, a defamation plaintiff asserting a claim for defamation per quod, like ERI, must prove special damages "proximately caused by the defamatory statements." *Cape Publ'ns, Inc. v. Reakes*, 840 So. 2d 277, 281 (Fla. 5th DCA 2003); *Harriss v. Metropolis Co.*, 160 So. 205, 207 (Fla. 1935) ("Where a publication is not privileged, and is not actionable per se because the publication as ordinarily understood will not naturally and necessarily cause injury, damages may be recovered upon proper allegations and proofs for such special injury as is the natural and proximate, though not necessary, consequence of the wrongful publication."); *Bobenhausen v. Cassat Ave. Mobile Homes, Inc.*, 344 So. 2d 279, 281 (Fla. 1st DCA 1977); *see Open Sea*

13

*Distrib. Corp. v. Artemis Distrib., LLC*, 692 F. Supp. 3d 1151, 1202 (M.D. Fla. 2023) (explaining differences between defamation per se and per quod); *see also Campbell v. Jacksonville Kennel Club*, 66 So. 2d 495, 497–98 (Fla. 1953).

Under Florida law, tortious interference has four elements: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985). The fourth element requires that the interference cause the damage of which the plaintiff complains. *See Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814–15 (Fla. 1994) (discussing injuries proximately caused by the interference and the plaintiff's entitlement to "the damages reasonably flowing from" the interference); *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 194 F. App'x 591, 603 (11th Cir. 2006) (per curiam).

For both defamation and tortious interference claims, a defendant's challenged conduct is the cause of the plaintiff's harms when the conduct directly and in natural and continuous sequence produces, or contributes substantially to producing, the loss, such that it is reasonable to conclude that, but for the conduct, the loss would not have occurred. *See* Fla. Std. Jury Instr. (Civ.) 405.9(a); Fla. Std. Jury Instr. (Civ.) 408.4(a); *KMS Rest.*, 194 F. App'x at

603; *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1254 (M.D. Fla. 2007), *aff'd*, 294

F. App'x 502 (11th Cir. 2008) (per curiam). Florida law does not require that

the challenged conduct be the exclusive or primary cause to be a proximate, or

legal, cause of an injury; rather, it may operate in combination with other

causes if it contributes substantially to producing the loss. *See* Fla. Std. Jury

Instr. (Civ.) 405.9(b); Fla. Std. Jury Instr. (Civ.) 408.4(b).

To begin, GEICO contends that there is no evidence that Conifer pulled

Day 1 work from ERI because of the press release. Mot. at 16, 22. Celler,

testifying both individually and as the corporate representative for ERI,

admitted that Conifer never informed him that the press release caused it to

reduce the work it provided to ERI. *See* Mot. at 19; Celler Dep. 185:21–23;

217:4–7. GEICO also points to Conifer's Senior Director of Vendor

Management's testimony that he first learned of the GEICO lawsuit in

February 2024 and was unaware of the press release at the time of his

deposition in July 2024. Mot. at 19; McNeley Dep. (Doc. 129-10) 34:3–11.

Similarly, the Conifer analyst who managed the relationship with ERI did not

know of the press release at the time of Conifer's decision. Mot. at 19; Floyd

Aff. (Doc. 129-13) ¶ 9.

In addition to averring that ERI has not identified any evidence that the

press release caused its damages, GEICO puts forth substantial evidence that

Conifer chose to shift Day 1 accounts from ERI because Conifer was displeased

with ERI's work on those accounts. GEICO relies on Conifer's Senior Director of Vendor Management's assertion that "[t]he scope of work between Conifer and ERI has been substantially reduced in recent years due to performance issues by ERI," McNeley Aff. (Doc. 129-14) ¶ 5, and the fact that Conifer continued to use ERI for retrospective work, which comes with lower expectations from the client, *see* Celler Dep. 141:11–12, for four years after the press release, *see* Mot. at 16, 18; JSUF ¶ 52. The Senior Director's affidavit is the closest either party comes to providing direct evidence of the reason for Conifer's decision, and even it does not specifically state that Conifer chose in March 2020 to shift Day 1 work from ERI because of ERI's performance issues on Day 1 accounts. Further, as ERI points out and I discuss *infra*, there are reasons to doubt how authoritative his statement is.

GEICO also points to Celler's admission that all ERI clients were displeased with ERI's performance:

> Q. But did you testify that as of December 2019, referring to your clients, did you testify they're all dissatisfied? Not one happy client based on the production of revenues the previous calendar year, which is what they look for. Let me finish.
>
> A. Yeah.

Celler Dep. 106:14–19. By January 2019, Conifer had pulled Day 1 work in some markets from ERI and expressed dissatisfaction with ERI's performance. *Id.* 146:22–147:12. Throughout 2019, Conifer complained to ERI regarding

16

ERI's lack of work on high value Day 1 accounts. *Id.* 147:13–24; 150:25–153:24;
157:7–158:16; September 5, 2019 email from Conifer's AR Vendor Operations
Director to ERI (Doc. 129-21) ("[A] quick review of the top 10 accounts show
extremely limited activity."); September 5, 2019 email from Conifer's AR
Vendor Operations Director to ERI (Doc. 129-22) ("Here are $2M worth of
accounts with no follow up or extremely limited and untimely follow up.");
December 9, 2019 email from Conifer's AR Vendor Operations Director to ERI
(Doc. 129-23) ("We also continue to see a lack of notes and inappropriate work
efforts on the high dollars as well."). As Celler admitted, "[a]ccounts should
have been worked more regularly. They weren't." Celler Dep. 153:13–14.

In December 2019, Conifer informed ERI that, absent improvements in
the rate of collection on ERI's inventory by March 31, 2020, Conifer would
begin to seek other vendors. *See id.* 181:25–184:1; (Doc. 129-26). The evidence
shows that ERI's performance issues continued into 2020. *See* (Doc. 129-27)
(January 6, 2020 email from Conifer to ERI stating, "There are so many red
flags on this account and very poor work efforts."); (Doc. 129-32) (January 17,
2020 email from Conifer to ERI identifying errors in ERI's work); (Doc. 129-28)
(February 6, 2020 email from Conifer to ERI describing ERI's work as
"absolutely ridiculous"); (Doc. 129-29) (March 4, 2020 email from Conifer to
ERI identifying errors in ERI's work); (Doc. 129-17) (March 6, 2020 email from
Conifer to ERI complaining that ERI is improperly working accounts that are

17

closed or placed with other vendors); (Doc. 129-30) (March 9, 2020 email from
Conifer to ERI identifying errors in ERI's work).

ERI's lack of diligence was not the only problem that GEICO identifies.
Mot. at 17–18. Conifer was displeased with ERI's representatives
inappropriately binding Conifer's clients to unapproved settlements, *see* Celler
Dep. 166:24–167:21, the overall performance of offshore personnel that ERI
used to work accounts, *see id.* 172:1–175:12, and ERI's inappropriately sending
notices on Celler Law letterhead, *see* (Doc. 129-25). Conifer also complained
that ERI improperly disclosed patient protected health information to an
insurer, which caused a compliance investigation in February and March 2020.
Celler Dep. 169:9–15; (Doc. 129-16) (March 18, 2020 email from Conifer to ERI
describing the compliance issue); (Doc. 129-24) (email chain from February 19
through March 16, 2020, regarding the compliance investigation).

ERI does not dispute the evidence regarding its poor performance and
instead argues that there is also evidence that the press release contributed
substantially to Conifer's decision. Resp. at 9–10, 18–19. Although ERI attacks
the credibility of the two Conifer employees, McNeley and Floyd, Resp. at 12,
18,[3] ERI fails to put forth evidence that anyone at Conifer was even aware of

---

[3] ERI relies on purported admissions made by the two during depositions that call
into question whether either of them possesses knowledge of what the decisionmakers
at Conifer knew regarding the press release and why they chose to reduce their
reliance on ERI for Day 1 work. *See* Resp. at 12, 18. ERI failed to submit the

the press release at the relevant time, much less that the press release contributed substantially to Conifer's decision. *See* Resp. at 9–19. ERI argues that Conifer must have seen the press release because it involved Tenet-owned medical facilities for which Conifer worked, but ERI does not point to evidence to support this speculation. *See* Resp. at 11–12.

Absent evidence from Conifer, ERI argues that Celler's deposition testimony creates a material issue of causation. It does not. Celler's testimony consists of irrelevant information, conclusory allegations for which ERI provides no support, and claims that the record directly contradicts. *See, e.g.*, Celler Dep. 23:14–15, 41:15–17, 185:16–17, 185:25–186:1. ERI quotes repeatedly from Celler's testimony regarding the economic impact of losing the Day 1 work. *See* Resp. at 13. Accepting as true all Celler says on that score, it goes to the issue of damages, not causation. ERI makes much of Celler's testimony that "we haven't been able to win any new healthcare clients," and "Celler Law has no clients left, nor can we win or obtain new clients." Resp. at 10 (quoting Celler Dep. 23:14–15, 41:15–17). Of course, Celler Law is not a

---

referenced deposition testimony, and I do not consider ERI's specific arguments on this point. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) (per curiam) (refusing to consider purported deposition testimony that was not entered into the record). Though ERI does not cite them, the record contains other evidence that accomplishes the same end, which I do consider. *See* FED R. CIV. P. 56(c)(3). The Senior Director of Vendor Management held a different role at the relevant time. McNeley Aff. ¶ 2. The analyst admits that she "was not specifically informed of the reason for Conifer's decision to reduce work . . . sent to ERI." Floyd Aff. ¶ 8.

party to this lawsuit and its struggle to find new clients does not create an issue of causation for ERI premised on GEICO's press release. Further, this testimony provides nothing more than conclusory allegations that the press release prevents ERI from bringing in business, which will not suffice. *See, e.g.*, *Sumrall v. Georgia Dep't of Corr.*, 154 F.4th 1304, 1313 (11th Cir. 2025); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value [at the summary judgment stage.]"). ERI does not point to specific clients, other than Conifer, that it lost or from which it has been unable to obtain work. Indeed, ERI identifies no evidence of efforts to get new clients or work in the wake of the press release, much less that potential clients rejected ERI because of the press release.

Next, ERI relies on Celler's testimony that Conifer instructed ERI to "stop working on all GEICO accounts immediately after the press release," and "[Conifer] told [Celler] to stop working on all GEICO [ac]counts after the press release." *See* Resp. at 10, 17; Celler Dep. 185:16–17, 185:25–186:1. Celler's recollection is flatly contradicted by the record. When asked if he remembered that Conifer provided this directive because of an unrelated class action settlement, Celler said he did not recall being given a reason. *See* Celler Dep. 186:2–10. The emails between Conifer and ERI regarding the stop work order make clear that Conifer gave the order for reasons unrelated to the press

20

release. *See* (Doc. 150-1). Conifer sent the initial email on March 12, 2020, and stated that ERI needed to stop work on "all Florida Geico claims in its inventory *in the settlement period*." *Id.* at 3 (emphasis added). Subsequent emails between Conifer and ERI continue to reference the class action settlement: " 'Is it all accounts with Geico listed or just the accounts in the class action settlement for misapplied deductibles?' . . . 'It is anything with Geico in the DOS range for the settl[e]ment period . . . [a]nything Geico outside of the DOS range is still good to go.' " *Id.* at 1–2. Conifer even clarified that this applied to other vendors as well. *Id.* at 1. To the extent ERI offers Celler's testimony for the implication that the press release caused the stop work order, I disregard Celler's testimony on this point. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253–54 (11th Cir. 2013) (explaining that at summary judgment courts do not have to accept a plaintiff's testimony when it is blatantly contradicted by the record (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).

ERI also points to emails that GEICO sent in furtherance of settlement negotiations in October 2020 as evidence that the press release was intended to harm ERI. *See* Resp. at 15. This is irrelevant to causation.

In the end, ERI is left arguing that the timing of the press release and Conifer's actions suffices for a reasonable jury to infer causation. Recall that GEICO issued the press release on March 2, 2020, and Conifer notified ERI

that it would not place additional Day 1 accounts with ERI on March 20, 2020.
Resp. at 11, 13–14, 17–18. All ERI's evidence of why Conifer shifted Day 1 work
from ERI is circumstantial (at best), particularly in the absence of identifying
a single decisionmaker at Conifer who was even aware of the press release at
the time.

On the other hand, there is direct, uncontroverted evidence from Conifer
that ERI's performance problems caused the decision. As such, GEICO argues
that there is insufficient evidence for a reasonable jury to find causation. *See*
Mot. at 20; Reply (Doc. 151) at 5–6; *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d
739, 743 (11th Cir. 1996) ("Where the evidence is circumstantial, a court may
grant summary judgment when it concludes that no reasonable jury may infer
from the assumed facts the conclusion upon which the non-movant's claim
rests.").

In analogous situations, courts have repeatedly held that temporal
proximity, without more, is insufficient for a reasonable jury to infer causation.
The Eleventh Circuit affirmed the reversal of a jury's award of special damages
in a defamation case because inferring causation from temporal proximity was
inadequate under even more compelling circumstances. *See Simon v. Shearson
Lehman Bros.*, 895 F.2d 1304, 1318 (11th Cir. 1990).[4] In *Simon*, the plaintiff

---

[4] California defamation law governed, but, like here, there were questions of whether
the plaintiff proved special damages caused by the defamatory statement. *See Simon,*

served as the business manager for a client and had a mounting record of friction with the client, who had considered firing the plaintiff due to these issues. *Id.* at 1317–18. A third party made a defamatory statement about the plaintiff to the client on November 9. *Id.* at 1309. The plaintiff testified that the day after the statement, the relationship with the client deteriorated and the client called him and accused him of stealing money. *Id.* On December 6, the client delivered a letter to the plaintiff terminating him as business manager effective December 31. *Id.* at 1310. The client testified that he did not fire the plaintiff immediately after the call "on the advice of his attorney." *Id.* at 1317. The client admitted that his decision to terminate the plaintiff came after the defamatory statement, but did not specify when the decision was reached. *Simon v. Shearson Lehman Bros.*, 665 F. Supp. 1555, 1573 (N.D. Ga. 1987), *aff'd in part, rev'd in part*, 895 F.2d 1304 (11th Cir. 1990). The plaintiff argued that the jury was entitled to infer that the decision was made immediately after the defamatory statement and the trial court disagreed. *Id.* at 1573–74.

The plaintiff never asked the client, who testified, whether the defamatory statement was a factor in terminating the plaintiff. *Simon*, 895 F.2d at 1318. The Eleventh Circuit affirmed the district court's reversal of the

---

895 F.2d at 1313, 1316–18. Thus, the analysis is applicable. *See Daniels v. HSN, Inc.*, No. 818CV3088T24JSS, 2020 WL 533927, at *6 n.5 (M.D. Fla. Feb. 3, 2020) (noting that *Simon*'s special damages analysis is consistent with Florida law).

jury's award of special damages. *Id.* When affirming, the Eleventh Circuit
distinguished the case from others "where testimony revealed that the slander
figured prominently in the minds of those who ultimately took adverse action
against the plaintiffs, no evidence in this case shows that [the client]
specifically considered the slanderous statement in terminating [the plaintiff].
Instead, the jury is left only with inference." *Id.* Inference alone was
insufficient for a reasonable jury to find that the statement was a substantial
cause of the termination. *See id.*

Simon presents a stronger case for inferring causation from temporal
proximity than here. In *Simon*, it was undisputed that the client knew of the
defamatory statement at the relevant time. Further, the client had an
observable negative reaction to the statement and there was evidence that the
relationship with the client took a further downturn the day after the
defamatory statement.

In comparison to *Simon*, ERI seeks multiple inferences to arrive at
causation. ERI shows no evidence that Conifer knew of the press release at the
relevant time, so it seeks inferences that Conifer's decisionmakers were aware
of the press release, that one of them had a negative reaction to the press
release, and that the press release substantially contributed to one of those
decisionmakers' determination to wind-down Day 1 work with ERI. Although
parties are not inherently prohibited from stacking inferences in federal court,

24

they may do so only when reasonable. *See Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982). ERI's stacked inferences are not. Despite ERI's claims that Conifer fired it "immediately following the press release," Resp. at 11, Conifer sent ERI the notice of its decision eighteen days after the press release and after months of uncontroverted disputes. Like *Simon*, "no evidence in this case shows that [Conifer] specifically considered the slanderous statement in terminating [ERI]." F.2d at 1318. Like *Simon*, this is insufficient.

Similar to *Simon*, the Seventh Circuit has found temporal proximity alone insufficient to prove causation in a defamation action. *See Cont'l Nut Co. v. Robert L. Berner Co.*, 393 F.2d 283, 287 (7th Cir. 1968). In *Continental Nut*, the plaintiff offered evidence that a subset of customers knew of the defamatory statement and that some of that subset ceased ordering from the plaintiff after publication of the statement. *Id.* at 285. Further, the plaintiff offered evidence that other customers stopped doing business with it around the same time and submitted a (flawed) expert's report indicating that sales fell short of projections for the years after the defamatory statement. *Id.* at 285–86. But because the plaintiff did not produce evidence from any customer that they stopped doing business with the plaintiff in part because of the defamatory statement, the district court held, and the Seventh Circuit affirmed, that the jury was left to improperly speculate as to the causation. *See*

25

*id.* at 286–87. Ultimately, "evidence of a decline in sales and profits after the publication is not enough to support a verdict because it fails to show causal connection between the publication and the loss." *Id.* at 287.

Likewise, the Tenth Circuit reversed a denial of judgment notwithstanding the verdict and remanded for a new trial on similar facts. *See Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 521–22, 542 (10th Cir. 1987) ("The inferences required to establish proof of defamation in this case do not follow from the evidence and must be rejected," where the evidence was limited to a chronological rendition of events indicating that the first purportedly defamatory statement preceded the plaintiff's financial downturn). In doing so, the Tenth Circuit held that if, on remand, the plaintiff again relied on declining sales after the defamatory statement as the basis for its damages, the jury must be cautioned that such figures "are to be used as background information only, and that they are not to assume either causation or amount of damage from those figures." *Id.* at 542; *see Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 115–17 (3d Cir. 1980) (deeming evidence that competitors' complaints to supplier preceded supplier's termination of agreement with plaintiff insufficient to permit a reasonable inference that defendant terminated plaintiff's distributor agreement because of competitor's complaints); *Elec. Furnace Corp. v. Deering Milliken Rsch. Corp.*, 383 F.2d 352, 355 (6th Cir. 1967) ("[A] mere showing of such decline [in

business] is not enough [to prove damages caused by the defamatory statements] where the accused statements cannot be regarded as libelous per se."); *cf. Charlottesville Music Ctr., Inc. v. Magnepan, Inc.*, 655 F.2d 38, 40–41 (4th Cir. 1981) (affirming judgment notwithstanding the verdict on special damages because to find causation merely from the fact that sales at nearby facility dropped after the defendant began disparaging the plaintiff generally, but without referencing the nearby facility, was insufficient—especially because there was evidence of multiple other factors that directly contributed to the loss in sales).

Further, Eleventh Circuit precedent in the employment discrimination and retaliation context—where courts have thoroughly considered under what conditions a temporal proximity argument is enough to permit inferences on causation—indicates that the inference ERI seeks here is unreasonable. When a plaintiff employee's argument for causation in a retaliation case rests on temporal proximity alone, summary judgment is appropriate for the defendant employer when the employer took adverse action that it contemplated prior to the employee's protected activity. *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006). There is an analogous sequence of events here. ERI does not dispute that, at least by December 2019, Conifer seriously considered winding down Day 1 business because of ERI's performance issues. *See* Celler Dep. 181:25–184:1; (Doc. 129-26). The many follow-on emails in early 2020 confirm

Conifer's frustrations. *See* (Docs. 129-17, 129-27, 129-28, 129-29, 129-30, 129-32). And Conifer set the performance improvement deadline of March 31, 2020, almost three months before the press release. *See* Celler Dep. 181:25–184:1; (Doc. 129-26). The press release is analogous to an employee's protected activity, and Conifer's decision to shift business away from ERI is the adverse action. The fact that the decision came after the press release is insufficient on its own because Conifer took the exact action it contemplated long before GEICO issued the press release.

No reasonable jury could conclude from temporal proximity alone, particularly in the light of all the other direct evidence of Conifer's decision that the press release was a cause of Conifer's decision. Thus, GEICO is entitled to summary judgment on ERI's defamation and tortious interference claims.

## IV.    CONCLUSION

Because Celler has not identified an injury to himself, he has no standing to bring his defamation claim. I must dismiss it without prejudice.[5] For its part, ERI fails to identify a genuine dispute of material fact on causation in both its defamation and tortious interference claims. ERI produces no evidence of

---

[5] Alternatively, even if Celler had an Article III injury, his claim would fail for the same reason as ERI's: lack of evidence of causation.

causation and argues instead for causation inferred from temporal proximity alone. No reasonable jury would find causation on this record.

The following is therefore **ORDERED:**

1.  Defendants' Motion for Summary Judgment (Doc. 132) is **GRANTED in part.** Specifically, the Court grants the motion regarding Counts I and III of Plaintiffs' Second Amended Complaint (Doc. 80).

2.  Count II of Plaintiffs' Second Amended Complaint (Doc. 80) is **DISMISSED without prejudice.** The Clerk is directed to **TERMINATE** Plaintiff Bobbie Celler from this case.

3.  The Clerk is directed to **ENTER JUDGMENT**, which shall read: "Judgment is entered against Emergency Recovery, Inc., and in favor of Government Employees Insurance Company, Geico Indemnity Company, Geico Casualty Company, and GEICO General Insurance Company."

4.  Defendants' *Daubert* Motion (Doc. 125), Defendants' Motion for Judicial Notice (Doc. 133), and Plaintiffs' *Daubert* Motion (Doc. 134) are **DENIED as moot.**

5.  The Clerk is further directed to **TERMINATE** all deadlines and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on December 29, 2025.

Kathryn Kimball Mizelle
United States District Judge